IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAHMAL PHOENIX,<br><br>                *Plaintiff*,<br><br>    v.<br><br>COATESVILLE AREA SCHOOL DISTRICT,<br><br>                *Defendant*. | CIVIL ACTION<br>No. 15-00072 |

PAPPERT, J.                                                                                       May 24, 2016

## **MEMORANDUM**

        Jahmal Phoenix ("Phoenix") an African-American former middle school teacher in the Coatesville Area School District ("Coatesville") contends that Coatesville discriminated against him based on race when he was constructively discharged from his position in 2013. Phoenix's lawsuit alleged violations of 42 U.S.C. Section 1981, Title VII of the Civil Rights of Act of 1964, 42 U.S.C. Section 2000(e), *et seq.* ("Title VII") and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. Section 951, *et seq.* (Pl.'s Compl. ¶¶ 30–37, ECF No. 1.)

        Coatesville filed a motion for summary judgment on August 12, 2015. (ECF No. 12.) The Court granted the motion on the Section 1981 count, but denied it on the Title VII and PHRA counts. *See Phoenix v. Coatesville Area Sch. Dist.*, No. 15-00072 (E.D. Pa. Oct. 8, 2015). The parties tried the case from October 28 through October 30, 2015. (ECF Nos. 56, 58–59.) The jury returned a verdict for Coatesville, finding that Phoenix failed to prove by a preponderance of the evidence that Coatesville "terminated or constructively discharged [him] on the basis of his race." (ECF No. 62 at 1.) The Court entered judgment consistent with the verdict. (ECF No. 60.)

1

Before the Court is Phoenix's motion for new trial pursuant to Federal Rule of Civil Procedure 59(a).  (Pl.'s Mot. for New Trial ("Pl.'s Mot."), ECF No. 64.)  Phoenix claims he is entitled to a new trial because he was allegedly prejudiced by erroneous evidentiary rulings.  (*Id.* at 6.)  Coatesville contends that the Court's rulings were correct and that even if the Court erred, the errors were not so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice.  (Def.'s Opp. to Pl.'s Mot. for New Trial ("Def.'s Opp.") at 22–27, 29, ECF No. 67.)  For the following reasons, the Court denies Phoenix's motion.

**I.**

Federal Rule of Civil Procedure 59(a)(1)(A) allows the trial court to grant a new trial after a jury verdict "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  A court may grant a new trial for various reasons: (1) improper admission or exclusion of evidence; (2) improper instructions to the jury; (3) newly discovered evidence exists that would likely have altered the outcome of the trial; (4) improper conduct by an attorney or the court which unfairly influenced the verdict; (5) the jury's verdict is against the clear weight of the evidence; or (6) the verdict is so grossly excessive or inadequate as to shock the conscience.  *See Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 676 (3d Cir. 2002) (citing *Becker v. ARCO Chem. Co.*, 207 F.3d 176, 180 (3d Cir. 2000)); *see also Marcavage v. Bd. of Trustees of Temple Univ.*, 400 F. Supp. 2d 801, 804 (E.D. Pa. 2005).  The overriding principle is that a court has the power to order a new trial to prevent injustice.  *See Murphy v. Radnor Twp.*, No. 11-4743, 2014 WL 2135998, at *2 (E.D. Pa. May 22, 2014).

The decision to grant a new trial is within the sound discretion of the trial court.  *See, e.g.*, *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1017 (3d Cir. 1995); *Murphy*, 2014 WL 2135998, at *2; *United Nat'l Ins. Co.*

*v. Aon Ltd.*, No. 04-539, 2009 WL 2245373, at *5 (E.D. Pa. July 24, 2009). Where the motion for new trial is based on an assertion of legal error, the court conducts a two-step analysis. *Murphy*, 2014 WL 2135998, at *2. First, the court determines whether it erred at trial. *Id.* Second, if the court finds error, it decides "whether that error was so prejudicial that refusal to grant a new trial would be 'inconsistent with substantial justice.'" *Farra v. Stanley-Bostitch, Inc.*, 838 F. Supp. 1021, 1026 (E.D. Pa. 1993) (quoting *Bhaya v. Westinghouse Elec. Corp.*, 709 F. Supp. 600, 601 (E.D. Pa. 1989)).

## II.

Phoenix's lawsuit relies on an unfortunate and rather sordid background. Richard Como ("Como") served as Coatesville's superintendent until a number of his misdeeds, alleged criminal activity and relevant to this case his penchant for referring to African-Americans in racist terms, came to light. Como is white. His apparent racism, along with his overall involvement in school district personnel decisions, led Phoenix to conclude that he was forced out of his teaching position because of his race. Phoenix contends the Court erred by: (1) excluding some of Como's "overtly racist text messages;" (2) excluding evidence of Coatesville's subsequent "efforts to conceal or destroy racist text messages;" (3) admitting Coatesville witness (and Phoenix's direct supervisor) Dr. Denise Ray's "speculative and hearsay testimony;" (4) excluding a Chester County Grand Jury's Investigative Report ("Grand Jury Report") on Como's financial mismanagement, fraud, nepotism and misuse of district funds and property; and (5) excluding an Investigative Report prepared by Coatesville's outside counsel, who were tasked with looking into Como's conduct. (Pl.'s Mot. at 8.)

Before trial, Coatesville filed an omnibus motion seeking to preclude Phoenix from offering at trial any evidence, testimony, argument, or references to four documents: (1) a

February 9, 2015 letter from Coatesville attorney Matthew Haverstick to his client; (2) text messages purportedly between Como and former Coatesville high school athletic director James Donato ("Donato"); (3) the Grand Jury Report; and (4) the Investigative Report. *See Phoenix*, No. 15-00072, slip op. at 1 (E.D. Pa. Oct. 13, 2015). Phoenix naturally opposed Coatesville's motion in all respects.

### A.

The Court issued its decision on the omnibus motion on October 13, 2015, granting it in part and denying it in part as it pertained to the text messages between Como and Donato. *See Phoenix*, No. 15-00072, slip op. at 2–3 (E.D. Pa. Oct. 13, 2015). Ironically, Phoenix did not seek reconsideration of the Court's decision, Coatesville did. (ECF No. 49.) Phoenix in fact opposed Coatesville's motion. (ECF No. 50.) The Court denied Coatesville's motion for reasons stated on the record. *See Phoenix*, No. 15-00072 (E.D. Pa. Oct. 28, 2015) (order denying motion for reconsideration); *see also* (Pl.'s Mot., Ex. A 3:12–14:21.)

The Court described the text messages between Como and Donato as a "collection of, among other things, vile, racist, misogynistic, and anti-Semitic exchanges between Como and Donato over a period of several weeks in June 2013." *Phoenix*, No. 15-00072, slip op. at 2 (E.D. Pa. Oct. 13, 2015). Not all of them, however, were relevant to Phoenix or his claims in this case. Federal Rule of Evidence 403 allows relevant evidence to be excluded if its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Applying Rule 403, the Court found the following exchange between Como and Donato to be relevant and probative because it directly mentioned Phoenix's firing and, by implication, his race:

>6-7 2013 FROM COMO: Right this could be classic conclusion to board mtgs by end of month plus 23 get clipped tuesday am before committee mtg and prob 6 to 9 more in July if Ritter budget numbers right.
>
>6-7 2013 FROM DONATO: How many niggers out of 23? Not enough!
>
>6-7 2013 FROM COMO: Dont know but think only 4-5. At most until last minute rush of firing by Goo of Phoenix and Kamara.
>
>6-7 2013 FROM DONATO: Good hangings there!

*Id.* at 3–4.

Phoenix now argues the Court should have allowed all text messages between Como and Donato into evidence. Specifically, Phoenix contends that "[b]ecause the Court excluded the text messages where Como frequently used the word 'nigger,' Plaintiff was severely prejudiced." (Pl.'s Mot. at 11.) Phoenix's position is grounded in his belief that the jury should have seen and heard about all of Como's ignorant comments and transgressions, whether they were relevant to his discharge or not. Phoenix wanted to be sure the jurors came to two related conclusions: that Como was a racist and that he was involved in Phoenix's discharge because of his overall control of school district personnel decisions. In its pretrial rulings, the Court carefully balanced the relevance, probative value and likely prejudicial impact of Como's overall conduct and allowed into evidence everything Phoenix needed to make his point. The jury heard plenty of evidence of Como's use of racial epithets, in relation to Phoenix as well as others, and his control of Coatesville's hiring and firing process.

Three witnesses testified at trial—Phoenix, Dr. Teresa Lee Powell ("Powell"), director of middle school education, curriculum and instruction at Coatesville and Dr. Ray ("Ray"), former assistant principal and then principal at Scott Middle School. (*Id.*, Ex. A–C.) Powell testified for the Plaintiff, while Ray was called as a witness for Coatesville. (*Id.*) Hierarchically, Phoenix

reported to Ray, who reported to Powell, who reported to Como. (*Id.*, Ex. B 20:7–17.) Ray and Powell are African-American.

Phoenix elicited testimony regarding Como's use of racial epithets and his involvement in personnel decisions. Powell testified that Como had "total control" over personnel decisions at Coatesville, including hiring and firing. (*Id.*, Ex. A 56:15–57:4.) She provided an example of Como's involvement in Phoenix's assignments. Powell explained that Coatesville had budgetary problems when Phoenix taught computer applications at Scott Middle School. (*Id.*, Ex. A 52:5–53:14.) The school district held a cabinet meeting, at which both Powell and Como were present, to decide how to fix the budget shortfall. (*Id.*) The cabinet agreed to eliminate all computer applications positions at Coatesville middle schools and reassign those teachers. (*Id.*) Accordingly, Powell testified that Phoenix was reassigned to teach "math proficiency" for sixth through eighth grades at Scott. (*Id.*, Ex. A 53:9–54:6.) Powell stated that she told Como that Phoenix was neither qualified nor certified to teach the course, but that Como felt "anyone could teach middle school math." (*Id.*, Ex. A 54:10–56:14.) She testified that Phoenix could have been moved to teach other classes, including a high school computer applications course taught by a high school sports coach. (*Id.*, Ex. A 89:17–90:2.) Powell discussed this option with Como, but noted that "one of [] Como's coaches would have lost their job if [] Phoenix would have been placed up there." (*Id.*)

The jury also heard of Como's direct involvement in Phoenix's discharge. Powell testified that Phoenix received an "unsatisfactory" review based on his performance and was about to receive a second such review when Como told her "to get rid of him." (*Id.*, Ex. B 81:2–3.) Powell told the jury that Daniel Mento ("Mento")—a Caucasian teacher—replaced Phoenix.

(*Id.*, Ex. A 66:15–67:11.)  Mento also opposed teaching the "math proficiency" course because he was similarly uncertified.  (*Id.*)

Powell also testified about her reaction to the text messages between Como and Donato.  She was "[i]ncredulous that the superintendent of our school district [Como] could communicate with others about African-Americans that way."  (*Id.*, Ex. A 64:25–65:4.)  Powell stated that this was not the first time Como had used the "n-word" in her presence: "the n-word . . . just rolled right off of his lips . . . [h]e just would say the word . . . [h]e didn't care who was around   . . . it just flowed right off of his mouth."  (*Id.*, Ex. A. 65:12–22.)  Powell even said that after reading the text messages she "absolutely did" think race played a role in Phoenix's termination and that Como "did not want [] Phoenix in the district."  (*Id.*, Ex. A 66:1–6, 67:12–17.)

Phoenix testified that he knew "Como had his hand in everything" and that "[Como] was responsible for all the hiring-and-firing decisions within the district."  (*Id.*, Ex. A 117:24–118:1.)  Phoenix acknowledged that he was replaced by Mento and that Coatesville allowed Mento to transfer classes—an opportunity which Phoenix requested and Coatesville denied.  (*Id.*, Ex. B 109:25–110:22.)  Phoenix testified that he learned of the text messages between Como and Donato by reading an article in the local newspaper after he left Coatesville.  (*Id.*, Ex. A 111:3–10.)  Phoenix "couldn't believe that he [Como] would say those things about [him] and then use those terms [racial epithets]."  (*Id.*, Ex. A 111:11–21.)  In his motion for new trial, Phoenix argues that he was not permitted to opine on Como's use of racial epithets.  (Pl.'s Mot. at 8–12.)  The Court however allowed him to testify about his reaction: "when I saw hangings [in the text messages], it . . . conjured up the images of, you know, blacks being lynched" and that reading the messages made him think his separation from Coatesville had "something to do with [] race."  (*Id.*, Ex. A 112:1–5, 20–23.)

During closing statements, Phoenix's counsel highlighted Como's control over Coatesville's personnel decisions and his use of racial epithets.  Counsel contended that Como "set [Phoenix] up to fail" by reassigning him to teach math proficiency (*Id.*, Ex. B 90:11–20) and that after Como learned from Powell that Ray was about to issue Phoenix a second unsatisfactory review, he said Phoenix "was out of here."  (*Id.*, Ex. B 95:24–96:4.)  Counsel also argued that Como was just as bad as Donato for not correcting his use of the "n-word" and "good hangings," and that Como should have been fired.  (*Id.*, Ex. B 94:6–24.)

While Phoenix's case rested in large part on Como's racism and involvement in district personnel decisions, including the decisions pertaining to Phoenix, Coatesville explained that Phoenix was discharged for poor performance and unprofessionalism.  Powell acknowledged that Phoenix struggled as a math teacher, specifically with lesson plans, and that Ray put him on a performance improvement plan and gave him an unsatisfactory performance evaluation.[1]  (*Id.*, Ex. A 85:1–89:4.)  Powell conveyed all of this to Como.  (*Id.*)  Powell also testified that when a teacher gets two unsatisfactory reviews that teacher is typically terminated.  (*Id.*, Ex. A 62:9–12.)  Powell believed that Coatesville would terminate Phoenix if he received another unsatisfactory evaluation.  (*Id.*, Ex. A 91:19–21.)

Phoenix admitted that at times his behavior was unprofessional and immature.  (*Id.*, Ex. A 131:7–13.)  Specifically, he conceded that he was suspended for balling up and throwing at Ray a memorandum Ray prepared about turning lesson plans in on time.  (*Id.*, Ex. A 131:14–132:3.)  Phoenix also testified that Erika Zeigler ("Zeigler"), Coatesville's human resources director, informed him that he was going to receive a second unsatisfactory performance evaluation based on his teaching performance, and that he would be terminated as a result of

---

[1]  Phoenix also acknowledged, and Ray confirmed, that Ray put him on a performance improvement plan.  (Pl.'s Mot., Ex. B 24:12–22, 105:9–17.)

receiving two such evaluations.  (*Id.*, Ex. A 106:8–107:18.)  Furthermore, he stated that Zeigler told him that if he resigned instead of being terminated that he would not lose his teaching certificate.  (*Id.*, Ex. A 107:19–108:13.)  Phoenix acknowledged that he could not teach in Pennsylvania without a certificate and chose to resign.  (*Id.*)

Ray wrote a memorandum to Phoenix regarding him throwing the memo at her, which was admitted into evidence without objection.  (*Id.*, Ex. B 75:18–77:6; Def.'s Opp., Ex. A at 17–18.)  Ray stated that "[i]t was appalling to watch you crumble the memo, and then throw it across the room during the faculty meeting.  Your behavior was immature and unprofessional."  (Def.'s Opp., Ex. A at 17–18.)  Ray warned that "[i]f unprofessional behavior like this happens again, it can lead to further disciplinary actions."  (*Id.*)  Ray also testified that she observed Phoenix's teaching as part of her routine classroom observation and noted that he had a problem with "lesson plans, writing them down, [identifying] strategies . . . that were needed, how he was going to teach . . . the students and then just implementing those plans."  (Pl.'s Mot., Ex. B 24:2–11.)

Throughout Ray's testimony, she reviewed several memoranda addressed to Phoenix, all of which were admitted into evidence without objection, regarding his failure to complete, submit or timely submit lesson plans.  (*Id.*, Ex. B 28:1–33:8, 75:18–77:6; Def.'s Opp., Ex. A at 5, 7, 9, 11, 13, 15, 26–27.)  Ray echoed Powell's testimony that she gave Phoenix an unsatisfactory performance evaluation and specifically gave him "poor" ratings for planning/preparation (lesson plans and content knowledge), instructional delivery (effective questioning, discussion techniques and student engagement) and professionalism.  (Pl.'s Mot., Ex. B 39:4–40:23, 50:6–9.)  Ray also testified that she issued Phoenix a second reprimand for unprofessionalism based on an incident on a school bus, *see infra* Part II.C, and for leaving his

9

class unattended to take a personal phone call. (*Id.*, Ex. B 45:16–46:21.) Ray's second reprimand was admitted into evidence without objection and she again warned that "[t]his lack of professionalism can lead to further disciplinary action." (*Id.*, Ex. B 75:18–77:6; Def.'s Opp., Ex. A at 31.)

In sum, Phoenix wanted the jury to focus on Como's use of racial epithets instead of Coatesville's evidence of Phoenix's poor job performance and its explanation for his firing. After listening to all of the evidence and assessing the credibility of the witnesses, the jury concluded that Phoenix did not prove that Coatesville terminated or constructively discharged him on the basis of his race. (ECF No. 62 at 1.)

**B.**

Phoenix also contends the Court erred by excluding evidence and testimony from the Grand Jury and Investigative Reports relating to Coatesville's "efforts to conceal and destroy the text messages." (Pl.'s Mot. at 12.) Phoenix's counsel noted this objection on the record before trial began:

> And in connection with, your Honor, this morning's conference, I had raised an issue about the circumstances and events that had occurred subsequent to the discovery of the text message. And as Your Honor remembers, I was trying to introduce evidence regarding his efforts to cover up the existence of text message [sic]. Your Honor ruled that just be excluded. I just need to take exception to that ruling.

(*Id.*, Ex. A 16:18–17:1.)

Any purported efforts to conceal or destroy the text messages, the essential contents of which were repeated for the jury *ad nauseum*, were completely irrelevant to whether or not Coatesville terminated or constructively discharged Phoenix because of his race.[2] Even if such

---

[2] Phoenix contends that "such spoliation evidence is highly probative and should have been admitted at trial." (Pl.'s Mot. at 12.) Phoenix never filed a spoliation motion.

evidence and testimony were relevant, their probative value was substantially outweighed by the danger of unfair prejudice and confusion of the issues. The task of assessing potential prejudice is "one for which the trial judge, considering his familiarity with the full array of evidence in a case, is particularly suited." *Construction, Ltd. v. Brooks-Skinner Bldg. Co.*, 488 F.2d 427, 431 (3d Cir. 1973).

## C.

Phoenix also argues that the Court "erred in admitting the hearsay and speculative testimony of Ray. (Pl.'s Mot. at 13.) Specifically, Phoenix contends the Court "erroneously" allowed Coatesville to "elicit out-of-court and speculative statements" from Ray regarding: "an April 2013 incident—involving Plaintiff—that occurred on a school bus following a high school track-meet [sic]" and "Plaintiff's alleged reaction to receiving a disciplinary memorandum in connection with said school bus incident." (*Id.* at 14.)

Phoenix centers his argument on the following exchange that took place during Ray's direct examination:

> Q: Did there come a time, again, Dr. Ray, when you disciplined Mr. Phoenix for professionalism issues?
>
> A: Yes, there was a—there was another time.
>
> Q: May I draw your attention to Exhibit L?[3] Does that memo talk about a professionalism issue that you—you engaged Mr. Phoenix in?
>
> A: It—it does. It talks about the bus track meet. I did issue—there was a bus track meet. And there was the assistant and the—the coach. Mr. Phoenix was the assistant coach, and there was another teacher who was the coach.

---

[3] "Exhibit L" was a memorandum from Ray to Phoenix entitled "RE: Bus Track Meet." (Def.'s Opp., Ex. A at 29.) The memo represented a "warning" to Phoenix concerning his "professionalism within [his] assistant track coach position." (*Id.*) Specifically, Ray stated that after watching a video of the school bus incident she could tell that Phoenix was "not paying attention to the students on the bus which lead to several students not following bus regulations." (*Id.*) Ray warned that similar behavior could "lead to further disciplinary action." (*Id.*) The memo was admitted into evidence without objection. (Pl.'s Mot., Ex. B 75:18–77:6.)

11

>   I received a complaint from a parent, somebody from the community, that the student—
>
>   MR. GOLD: Objection. Hearsay, your Honor.
>
>   THE COURT: Overruled.
>
> Q: You can continue.
>
> A: Oh, okay. That it was, received a phone call that the students were on the bus screaming, yelling out the window, inappropriate behavior on the bus. And that is something that, when we had our—our meetings, our class meetings, I would always talk about, you represent Scott Middle School, your behavior—behavior has to be stellar. However, it wasn't. And I did see the video and I did see students standing yelling out the window and I did see Mr. Phoenix sitting with his hoodie on and earphones in.
>
>   Mr., the other—other teacher was sitting to the side, kind of turned to the side looking at the students, saying some things to the student. I did write Mr. Phoenix up, however, and I talked to the coach, the head coach. I saw him in the hallway, in fact, I went to find him because I was very, I wasn't pleased with the fact that I got this call, and as well I saw the memo—I saw the video, I'm sorry, about this behavior.

(*Id.*, Ex. B 42:6–43:16.) Phoenix contends that Ray's testimony on the "parent complaint" was hearsay, as well as her testimony about the "specific content"[4] of the parent complaint. (*Id.* at 15.) None of the cited testimony was hearsay because the parent complaint was not offered to prove the truth of the matter asserted. FED. R. EVID. 801(c)(2). The complaint was that students were yelling, screaming and acting up on the bus. The statement had nothing to do with Phoenix and what he was or was not doing.

Phoenix cites a second exchange, also pertaining to the incident on the school bus, and argues that Dr. Ray's testimony was speculative:

> Q: What was Mr. Phoenix's reaction to your memo [concerning the school bus incident]?

---

[4] Phoenix did not object to Ray's testimony about the "specific content" of the parent complaint during trial.

> A: His reaction, unfortunately he was angry. I get that. He was frustrated. I understand that, too. He went back upstairs to his classroom, because I had pulled him out of the classroom, went to the classroom and he talked to—a student had a problem—
>
> MR. GOLD: Objection, objection. Speculation. Was not present when he returned to the classroom.
>
> THE COURT: Overruled.
>
> A: He went back to the classroom. A student needed help with a problem. He told the student that, I don't have time for you, I just got reamed out by Dr. Ray and had to take a phone call. Now my assistant—the child—and all the—please understand that my students know that if you have a problem with—with a teacher or you have any kind of issue, you can always come to my office or you can come to my assistant's office. One, is because I don't want them acting out in class. And if there's an issue that we need to handle as adults, we can—we can work this out, but I need to hear from them. So they knew that my door was always open, as well as my assistant.
>
> So this student went down to the assistant, my assistant's office. She was crying, she was upset. My assistant called me and said, what should I do about this? I said, I find it very hard to believe that Mr. Phoenix would say this. I said, I just, I—I really do. And just—just as a side note, Mr. Phoenix loves kids just as well as I do, so I had a hard time believing that. So I said to her, I said, please calm this child down. And you are to call individually other students in that class, because I wanted to know did another student hear that. Maybe this child was mistaken. Maybe she was just so upset about the problem.
>
> I didn't know, but I wanted to hear what else happened. Maybe somebody else heard it. We had, she called three or four students down, and they all heard it. And I—and I told her to call individually, not to call at the same time, not to tell them they're in trouble. I just wanted to know what happened. And they all concurred.

(*Id.*, Ex. B 43:23–45:14.) The Court need not address whether or not a specific aspect of Dr. Ray's testimony was speculative. The direct answer to the question about Phoenix's reaction to the memo—which was the whole point of the exchange—had already been provided based on Dr. Ray's interaction with Phoenix before he returned to the classroom. In any event, allowing Ray to testify about the classroom incident was not "so prejudicial that refusal to grant a new

13

trial would be 'inconsistent with substantial justice.'" *Farra*, 838 F. Supp. at 1026 (quoting *Bhaya*, 709 F. Supp. at 601). The overwhelming amount of other evidence that the jury heard and saw concerning Phoenix's poor performance and unprofessionalism, *see supra* Part II.A, led it to conclude that Phoenix was not constructively discharged on account of his race.

### D.

The Court allowed into evidence the portion of the Grand Jury Report that contained the text message exchange between Como and Donato in Part II.A *supra*. Phoenix argues the Court erred by not admitting the entire Report into evidence. (Pl.'s Mot. at 19–21.) The Grand Jury Report was a comprehensive investigation into allegations of Como's financial mismanagement, fraud, inappropriate hiring and nepotism and misuse of district funds and property. Phoenix contends both that the Court's "evidentiary ruling was erroneous" and the Court "ostensibly failed to address Plaintiff's argument that the Grand Jury Report should have been admitted, as conclusions and opinions in a public report are presumably admissible as long as the report is based upon factual investigation and is sufficiently trustworthy." (*Id.* at 20–21.) The Court did not err by only allowing the text message exchange into evidence. None of what Phoenix wanted the jury to see had anything at all to do with Phoenix or the reasons for his separation from employment. Again, the Court allowed Phoenix to present all the evidence the jury needed to conclude that Como, who had the "final say" on Coatesville personnel decisions, used racist terms to refer to African-Americans generally and Phoenix in particular.

### E.

Lastly, Phoenix contends the Court erred in "precluding all but . . . one . . . sentence" from the Investigative Report and "precluding Plaintiff's counsel from discussing the origin and background context of the sentence." (*Id.* at 22.) The Report was the result of an independent

internal investigation of Coatesville by Conrad O'Brien PC, into potentially criminal allegations dealing with "pervasive nepotism, favoritism and cronyism," alleged "misappropriation and theft of athletic department funds" and alleged "theft and/or diversion of cash payments for fundraisers." (*Id.*, Ex. D at 6–10.) Before trial, Coatesville moved to have the entire Report excluded. The Court agreed generally, but did admit a sentence from the Report stating that "Mr. Como had the ultimate authority and final say on hiring and firing at CASD [Coatesville Area School District]." *Phoenix*, No. 15-00072, slip op. at 4 (E.D. Pa. Oct. 13, 2015). The statement was relevant and probative because it demonstrated that Como had involvement in personnel decisions, specifically decisions to hire and fire Coatesville employees. The rest of the Investigative Report was irrelevant for the same reasons most of the Grand Jury Report was irrelevant: it had nothing to do with Phoenix.

The Investigative Report neither involved any race-related allegations nor investigated Phoenix's termination, but rather Como's alleged "fiscal mismanagement, lack of accountability, abuse of power and . . . misappropriation and even theft, of school district funds." (Pl.'s Mot., Ex. D at 1.) Phoenix notes three specific passages which the Court did not admit into evidence and argues that this "acutely affected" Phoenix's rights "in a negative way:" (1) "Mr. Como hijacked the hiring process at CASD, unilaterally deciding who would be hired and fired and who would be promoted to positions of authority within the District;" (2) "Mr. Como was given complete authority to hire and fire employees during the summer months;" and (3) "Many witnesses reported that nothing happened in the district without Mr. Como's knowledge and direct or indirect approval." (Pl.'s Mot. at 23; *Id.*, Ex. D at 7, 12, 18.) The Court allowed all of this information into evidence through the testimony of Powell, Phoenix and Ray as discussed *supra* Part II.A. Phoenix's motion is denied. An appropriate order follows.

BY THE COURT:


*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.